Sidney ELLIOTT et al., Plaintiffs,

v.

FEDERAL HOME LOAN BANK BOARD et al., Defendants, N. Joseph Ross et al., Intervenors.

EQUITABLE SAVINGS AND LOAN ASSOCIATION, Plaintiff,

v.

Sidney ELLIOTT et al., Defendants.

Sidney ELLIOTT et al., Cross-Claimants,

v.

FEDERAL HOME LOAN BANK BOARD et al., Cross-Defendants, N. Joseph Ross et al., Intervenors.

Sidney ELLIOTT et al., Plaintiffs,

v.

FEDERAL HOME LOAN BANK BOARD et al., Defendants.

LONG BEACH FEDERAL SAVINGS AND LOAN ASSOCIATION, Cross-Claimants,

v.

FEDERAL HOME LOAN BANK BOARD et al., Cross-Defendants.

EQUITABLE SAVINGS AND LOAN ASSOCIATION, Cross-Claimant,

v.

FEDERAL HOME LOAN BANK BOARD et al., Cross-Defendants, N. Joseph Ross et al., Intervenors.

Nos. 63-1072, 63-1107, 63-1230.

United States District Court
S. D. California,
Central Division.

Sept. 22, 1964.

George W. Trammell, Long Beach, Cal., for Sidney Elliott and Shareholders Protective Committee.

Moore & Lindelof, Los Angeles, Cal., for Equitable Savings & Loan Assn.

Charles K. Chapman, Long Beach, Cal., for Long Beach Federal Savings & Loan Association; Stanley Mosk, Atty. Gen. of California, San Francisco, Cal., for California Savings & Loan Comr.

Francis C. Whelan, U. S. Atty., Donald A. Fareed and James R. Dooley, Asst. U. S. Attys., Carl Eardley, Atty., Dept. of Justice, and Max Wilfand, Los Angeles, Cal., of counsel, for Federal Home Loan Bank Bd. and Federal Deposit Ins. Corp.

Pacht, Ross, Warne, Bernhard & Sears, by Harvey M. Grossman, Los Angeles, Cal., for intervenor N. Joseph Ross.

Blau & Schwartzman, Beverly Hills, Cal., for defendant Joseph Fields.

Fitzpatrick & Wiley, Los Angeles, Cal., for defendant and intervenor Richard Fitzpatrick.

HALL, District Judge.

There are preliminary and peripheral questions of jurisdiction, proper parties, and the like, but, in spite of the proliferation of documents and briefs on the separate motions of each party for summary judgment in these three actions, the central and ultimate question for decision is a limited one: Did the officers and directors of the Long Beach Federal Savings & Loan Association, and the Federal Home Loan Bank Board, or either of them, have the lawful power to alter the equal rights of all the depositors (sometimes called shareholders) in said Association so as to take the share of distributable assets on dissolution of said Association from several groups, and give that share to other groups defined in the Merger Agreement dated June 12, 1963, which groups had not ever been previously defined, or notified in any way at the time of deposit or pledge, by charter, statute, regulation or otherwise? An ancillary question as to whether or not the majority of the shareholders can thus affect the rights of any shareholder is also present.

It is to be noted at the outset that there is no claim of crime, fraud, illegality, or other wrongdoing against either Long Beach or Equitable Association, the officers and directors of either, or the Shareholders Protective Committee, or the shareholders of either Association, or any of them.

In order that the questions may be put in proper setting, it is necessary to recite some facts concerning which there is and can be no dispute.

The Long Beach Federal Savings & Loan Association was chartered as a Federal Mutual Savings and Loan Association on July 10, 1934, under what is now 12 U.S.C. § 1464. Its first charter was replaced by its second charter on July 10, 1937 [12 U.S.C. § 1464], under which it has at all times since operated and still exists as a mutual association without any alteration or amendment. The charter was and is in the terms and language prescribed by the Federal Home Loan Bank Board, and was drawn and signed by that Government institution. All passbooks and receipts for deposits contained the terms of the charter by reference. From modest beginnings of $7,500 in deposits in 1934, it grew so that on May 20, 1946, it had deposits by shareholders of over 22 million dollars, and on that date, one Ammann was appointed conservator by the Bank Board, without notice, and he immediately seized the Association and its assets. A run developed at once. It resulted in the withdrawal of approximately ten million dollars from the Association within a few days. Litigation ensued between the newly formed State-licensed Shareholders Protective Committee (Plaintiff in Action No. 63–1072, and Cross-claimant in the other two Actions), the Association, the Bank Board, Ammann, and

others.[1] A Congressional investigation also was had. On January 24, 1948 the Association was returned to the shareholders and to the management selected by them, which was the same management as before the seizure, at which time (January 24, 1948) its deposits were down to approximately 13 million dollars, and the Association was heavily in debt. The Association continued under its previous management until April 22, 1960, when it was again seized by an Agent of the Bank Board, without notice. On that date, its deposits by shareholders had grown to 96 million dollars. Immediately after the seizure by the Bank Board's agent, another run occurred to the Association, which resulted in withdrawals which, in a short time, totaled over 60 million dollars, which was approximately 70 per cent of the total shareholders' savings deposits. More litigation and another Congressional investigation ensued, as well as prolonged negotiations for settlement of the various controversies. The negotiations resulted in a Settlement Agreement of about 100 pages in length, which was dated February 14th, 1962. The Agreement, among other things, called for the return of the Association to its former management, and the dismissal of all the suits which concerned the merits of the disputes between the Association and the Bank Board. It provided for the merger of Long Beach with Equitable Savings & Loan Association, a California State-chartered association, the dissolution of Long Beach, and distribution of its surplus on a pro-rata basis to its shareholders. The features of that Agreement concerned with the pending motions will be touched on later. Many, if not all, of the suits to be dismissed were class actions, and under F.R.Civ.P. 23, this Court concluded that the widest possible notice should be given, and it was, and the Court fixed April 2nd, 1962, for the return of the Association. On that date, its total savings deposits were down to approximately 30 million dollars. Upon return of the Association to its manage-

1. The cases filed in this court arising out of that and subsequent disputes with the Bank Board are cases numbered: 5421, 7989, 13953, 13979, 15888, 16772, 16773, 16774, 16775, 16845, 17133, 17152, 18905, 15–57, 378–58, 506–60, 462–61, 63–590, 63–1072, 63–1107 and 63–1230. The reported decisions cover more than 400 pages of the Federal Supplement and the Federal Reporter, 2d., as follows:

Mallonee v. Fahey (D.C.S.D.Calif.1946) 68 F.Supp. 418; Fahey v. Mallonee (1947) 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030; Ex Parte Fahey (1947) 332 U.S. 258, 67 S.Ct. 1558, 91 L.Ed. 2041; Mallonee v. Fahey (D.C.1949) 14 F.R.D. 273; Home Loan Bank Board v. Mallonee (9 Cir. 1952) 196 F.2d 336, Cert. den. Mallonee v. Fahey, 345 U.S. 952, 73 S.Ct. 863, 97 L.Ed. 1374; Mallonee v. Fahey (9 Cir. 1952) 200 F.2d 918; Fahey v. O'Melveny & Myers (9 Cir. 1952) 200 F.2d 420, Reh. den. 12/17/52, Cert. den. 345 U.S. 952, 73 S.Ct. 863, 97 L.Ed. 1374, Reh. den. 345 U.S. 978, 73 S.Ct. 1120, 97 L.Ed. 1393; Fahey v. Calverley (9 Cir. 1953) 208 F.2d 197, Reh. den. 12/19/53, Cert. den. Utley v. Fahey, 347 U.S. 955, 74 S.Ct. 681, 98 L.Ed. 1100; Mallonee v. Fahey (D.C.S.D.Calif.1953) 117 F.Supp. 259; Federal Home Loan Bank of San Francisco v. Long Beach Federal Savings & Loan Association (D.C.1954) 122 F.Supp. 401; Mallonee v. Fahey (D.C.1954) 122 F.Supp. 472; Federal Home Loan Bank of San Francisco v. Long Beach Federal Savings & Loan Association (D.C.1954) 122 F.Supp. 960; Federal Home Loan Bank of San Francisco v. Hall, (9 Cir. 1955) 225 F.2d 349, Reh. den. 10/12/55, Cert. den. Mallonee, Bucklin & Fergus v. Federal Home Loan Bank of San Francisco, et al., 350 U.S. 968, 76 S.Ct. 438, 100 L.Ed. 840; Long Beach Federal Savings & Loan Association v. Federal Home Loan Bank of San Francisco (1955) 76 S.Ct. 32, 100 L. Ed. 1517; Ammann v. Home Investment Co. (9 Cir. 1957) 243 F.2d 748, 758; Long Beach Federal Savings & Loan Association v. Federal Home Loan Bank Board (D.C.1960) 189 F.Supp. 589; Federal Home Loan Bank Board v. Long Beach Federal Savings & Loan Association (9 Cir. 1961) 295 F.2d 403, Reh. den. 11/17/61.

The Court takes judicial notice of such files and records and reported decisions, as well as the record of several hearings before, and reports of, Congressional Committees which investigated the disputes between the Long Beach Federal Savings & Loan Association and the Home Loan Bank Board.

ment, money again flowed to it as deposits so that in the first two days approximately 24 million dollars had been deposited, some in sums of over $100,-000.00 and up. The deposits continued so that on June 30th, 1962, the total was 79 million plus dollars and on December 31st, 1962, the total deposits by the shareholders in the Long Beach Savings & Loan Association amounted to approximately 72 million dollars.

Prior to the April, 1960, seizure of that Association, and in late 1959, Long Beach had indicated to the Bank Board its desire to convert to a California State Building and Loan Association and become a part of the California State-chartered Equitable Savings & Loan Association. The negotiations had proceeded to a point where the California State examiners were in the Association on the date of its second seizure on April 22, 1960. After the seizure and during the negotiations resulting in the Settlement Agreement, the Association continued to indicate its desire to combine with Equitable and dissolve as a Federal mutual Association. Article XV of the Settlement Agreement is devoted to the detail of such conversion and dissolution of Long Beach by joining with Equitable Savings & Loan Association. After the return of the Long Beach Association to its management on April 2nd, 1962, the Association, Equitable and the Bank Board continued to negotiate the matter of such merger and conversion and the ultimate dissolution of Long Beach. The Merger Agreement dated June 12th, 1963, was the result of such negotiations. Until July, 1962, the Bank Board gave no indication of any desire that the shareholders were to share in the distributable assets other than on a pro-rata basis. But beginning in July, 1962, and until April, 1963, the Board "insisted" on a provision in the Agreement excluding all shareholders with over $100,000.00 on deposit from sharing in the distributable surplus, unless they were depositors in that sum on or before the second seizure, viz: April 22nd, 1960.

This was the first indication by the Bank Board to anyone- that the Bank Board desired to discriminate against any shareholder or treat any depositor other than on a mutual pro-rata basis as provided in the charter and the Settlement Agreement.

Long Beach officers and directors refused to accept this provision as not being in compliance with its charter or the law or the Settlement Agreement.

Then, in April, 1963, the Bank Board changed its position and, by the admission of the Government, "insisted" on the provisions in the Merger Agreement which are in dispute here, *and which would prohibit any depositor for any amount who has pledged his shares on a loan any place, and all depositors of over ten thousand dollars who were not such on April 22nd, 1960* (the date of the second seizure) *from sharing at all in the distributable surplus.*[2] The officers and directors of Long Beach refused to accede to this demand until the Bank Board consented to a provision in the Merger Agreement that any shareholder member could take appropriate action to contest the validity of the Merger Agreement or any part thereof. The text of the portion of the Merger Agreement in dispute follows:

### "ARTICLE VII

"The rights of Long Beach shareholders to receive stock in Equitable or other benefits under this Agreement shall be computed as follows:

"Long Beach has required waivers of participation rights for all additions to savings accounts and for all new savings accounts after November 30, 1962. Each member's share account balance or balances as of that date shall be reduced by (1) the amount of any Long Beach share loan as of November 30, 1962, and/or

2. The Board had more than a "tendency to wobble" in its position. The phrase is borrowed from Judge Pope in Anglo-

Canadian Shipping Co., Ltd. v. Federal Maritime Com'n (9 Cir. 1962) 310 F. 2d 606, at 611. See: Footnote 4.

the amount, as shown by the Long Beach books and records, for which each such share account was pledged or assigned, as of November 30, 1962, to any other person; (2) withdrawals from each such account subsequent to November 30, 1962, the last in, first out rule being applied to such withdrawals; and (3) the amount by which the total remaining balance or balances exceeds the sum of (a) $10,000 and (b) the balance or balances, if any, in such member's account or accounts on April 22nd, 1960.

"This Agreement is not intended to prohibit any shareholder member of Long Beach from taking appropriate action to exercise such rights, if any, which he may have to contest the merits or validity of the plan of dissolution of Long Beach, or any part thereof, incorporated herein.

"Long Beach and Equitable agree that no withdrawals made after the effective date of the Merger shall affect the right of any Long Beach shareholder hereunder as vested on said date, and said shareholders so withdrawing shall participate as fully as if such withdrawal had not been made.

"Each officer and director of Long Beach and Equitable shall participate in the distribution only to the extent of his respective share account as of April 22d, 1960, and shall furnish an affidavit to the Federal Home Loan Bank Board to the effect that he is not participating directly or indirectly in the distribution of Long Beach, except to the extent set forth in the proxy Statement.

"Members of the Shareholders Protective Committee, attorneys representing Long Beach, Equitable or the Shareholders Protective Committee and close relatives of such persons, and close relatives of officers and directors of Long Beach and Equitable and corporate entities controlled by any of them, shall not

participate in the distribution of stock as herein contemplated, except to the extent of the balances of such members' accounts in Long Beach as of April 22nd, 1960. Close relatives shall be deemed to mean spouses, children, parents, brothers, sisters, nephews, nieces and anyone married to one of the foregoing persons.

"The Board of Directors of Equitable will fix a record day for the determination of who are the stockholders and members entitled to notice and to vote at a special meeting of Equitable to consider its approval of this Merger Agreement or to consent to said Merger Agreement."

The first sentence of the second above-quoted paragraph is not in dispute. The effect of it was to fix November 30, 1962, as a "cut-off" date. It did not attempt to alter any shareholder's right without his consent, as is done in the second and succeeding sentences, around which this dispute centers.

The Bank Board had previously attempted to get Long Beach to accept a provision in the Settlement Agreement of February 14th, 1962, that the Association would "screen" and limit the size of deposits upon returning the Association and its assets to its elected management, but the Association refused to accede thereto, and there is no such provision in the Settlement Agreement. While Article XV of the Settlement Agreement, to which the Bank Board was a party, provided for the joinder of Long Beach Association and Equitable, and the dissolution of Long Beach, and pro-rata distribution of its surplus, no notice of any kind was given to the Association, its officers and directors, or its shareholders, or to the public, that the Bank Board would require preferred treatment for any shareholders before or at the time of the return on April 2, 1962, and not until July, 1962, when the Board indicated the above-mentioned demand that certain accounts of $100,000.00 and over forfeit any share in the distributable surplus; and no notice of any kind was

given to the Association, its Board of Directors, or officers, the shareholders, or the public that the Bank Board would require a forfeiture of all pledged accounts and all accounts over $10,000.00, of their right to share pro-rata in the distributable surplus of Long Beach, *until April, 1963*. On April 27, 1963, at a special meeting of the shareholders of the Association, a resolution was adopted condemning the attempt of the Bank Board to forfeit any shareholder's right to a proportionate share of the Association's net surplus, reserves, and undivided profits, and requesting Congress to again investigate the matter. This meeting was continued to June 15, 1963, and again continued to July 6, 1963, but the July 6th meeting was preceded by notice according to the charter, and by mailing to each shareholder or depositor a copy of the proxy statement containing a copy of the Merger Agreement dated June 12, 1963, and specially pointing out the dispute and the amount distributable under the Bank Board's demand and under the Association's claim. The dispute between the officers and directors of the Long Beach Association and the Bank Board, concerning the method of distributing the distributable assets, was fully discussed at that meeting, and the intention disclosed to file suit to insist upon pro-rata distribution to all shareholders rather than the discriminatory method preventing certain depositors from sharing at all in the distributable surplus, which the Government concedes the Bank Board "insisted" on being in the Merger Agreement. Proxies obtained by the Shareholders Protective Committee were voted by a written ballot which contained a provision that they were voted in favor of the Merger Agreement in reliance upon the provision therein which permitted any shareholder to litigate the right to receive distribution pro-rata. 99.4 per cent of those present in person or by proxy (constituting 64.4 per cent of all eligible shareholders) voted in favor of the Merger. The effective date of the merger was September 10th, 1963. On the same date, Case No.

63–1072–PH was filed in this court, and what is now Case No. 63–1230–PH was filed in the California Superior Court and later removed to this court. On September 17, 1963, Case No. 63–1107–PH was filed in this court. Each of the suits challenge the legality of the disputed provisions of Article VII of the Merger Agreement, and each seeks declaratory relief.

Other facts concerning which there is no genuine issue will be stated as may become necessary in the discussion of different questions of law.

Inasmuch as all parties are before the Court in Action No. 63–1107–PH, each seeking the same relief sought by that particular party in each of the other actions, the remainder of this Memorandum will be addressed primarily to the issues raised on the Motions for Summary Judgment in Action No. 63–1107–PH. It is an action in interpleader and for declaratory relief. [28 U.S.C. §§ 1335, 1397, 2201, 2202, 2361; F.R. C.P. 22, 56(a), 57]. The plaintiff Equitable claims no interest of any kind in and to the subject matter of the action. It admits the duty to issue the shares of stock to someone; it has deposited that stock in court; and it seeks adjudication as to whom it should issue the disputed shares. There is a genuine dispute, which if unresolved in an action such as this, could result in a multiplicity of actions by the some 60,000 shareholders of Long Beach Association, which fact alone is sufficient to support an interpleader action. It is, thus, a true interpleader action, and not one in the nature of interpleader. And even if it were, the same rules apply as they are both equitable actions. [Burchfield v. Bevans (10 Cir. 1957) 242 F.2d 239; Holcomb v. Aetna Life Ins. Co. (10 Cir. 1955) 228 F.2d 75, Cert. den. 350 U.S. 986, 76 S.Ct. 473, 100 L.Ed. 853, Reh. den. 350 U.S. 1016, 76 S.Ct. 657, 100 L.Ed. 875].

The subject matter of the action is the fund, thing, or duty to which the parties make adverse claims. [Degree of Honor Protective Ass'n v. Bisch (D.C.

Mass.1961) 194 F.Supp. 614]. Here, the stock in Equitable is the thing in dispute, and Equitable seeks to know its duty as to whom the stock should be issued. The stock exceeds in value the sum of $500.00, and is alleged to be in excess of nine million dollars,[3] and is deposited in this court. The court therefore has jurisdiction of the subject matter.

■ There is requisite diversity among the claimants to the stock. [Treinies v. Sunshine Mining Co. (9 Cir. 1938) 99 F.2d 651, Aff. 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85]. While the Bank Board claims no monetary interest in or to any of the stock of Equitable which is the subject matter of the action, it nevertheless claims a right to direct to whom the stock should go. It and the Federal Savings and Loan Insurance Corporation are "sue and be sued" entities. [12 U.S.C. § 1464(d) (1); 12 U.S.C. § 1725(c) (4)]. This court thus has jurisdiction of the parties as well as the subject matter under the Interpleader Statutes of the United States.

The Cross-claimants and Intervenors, as well as Equitable, seek relief under the Declaratory Relief Statutes [28 U.S.C. §§ 2201–2202]. A summary judgment may be granted in such action [F.R.C.P. 56(a)], and the existence of another adequate remedy does not preclude a judgment in a declaratory relief action. [F.R.C.P. 57].

■ The relief sought by the Cross-claimants and Intervenors in Action No. 63–1107–PH arises out of the same transaction and occurrence as gives rise to Equitable's suit in interpleader, viz.: the Merger Agreement and the disputes recognized therein and arising out of it, as to whom the disputed shares of stock in Equitable should issue. They are, therefore, proper parties under F.R.C.P. 13 governing cross-claims, and F.R.C.P. 24 relating to intervention.

■■ The Administrative Procedure Act is applicable to the Bank Board, and its actions are judicially reviewable, and it does not have "uncontrolled discretion." [Home Loan Bank Board et al. v. Mallonee (9 Cir. 1952) 196 F.2d 336, Cert. den. Mallonee v. Fahey, 345 U.S. 952, 73 S.Ct. 863, 97 L.Ed. 1374; Federal Home Loan Bank Board v. Long Beach Federal Savings & Loan Association (9 Cir. 1961) 295 F.2d 403]. That being so, the Plaintiff Equitable and each of the Cross-claimants and intervenors have standing to sue, and this court has jurisdiction of defendants Bank Board and Federal Savings and Loan Insurance Corporation under the terms of Section 10 of the Administrative Procedure Act [5 U.S.C. § 1009], particularly subdivision (c) thereof which provides that: "every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review."

■ Even if this court did not have jurisdiction of the Bank Board and the Insurance Corporation on the original Complaint, under the Administrative Procedure Act and the Interpleader Statutes it does have undoubted jurisdiction on the Cross-claim of Long Beach, *and all the rights and duties of all the parties can, indeed, they must, be adjudicated if the rights and duties of the Association or of any one shareholder are adjudicated by way of declaratory relief.*

■ The Cross-claim of Long Beach is a compulsory Cross-claim. It is well settled that jurisdiction of a counterclaim persists, even if the original action fails, where it is supported by an independent ground of federal jurisdiction. [Pioche Mines Consol. Inc. v. Fidelity-Philadelphia Trust Co. (9 Cir. 1953) 206 F.2d 336, Cert. den. 346 U.S. 899, 74 S.Ct. 225, 98 L.Ed. 400]. And it is equally well settled that a Cross-claim likewise will vest jurisdiction in the court if there is an independent ground of jurisdiction on the Cross-claim,

---

3. By stipulation, an Order was made for the distribution of about seven million dollars worth of stock which had been deposited in court, so that the disputed stock remaining is valued at something more than two million dollars.

regardless of jurisdiction or lack of it on the original action. [Pierce v. Perlite Aggregates, Inc. et al. (D.C.N.D.Calif. 1952) 110 F.Supp. 684, Aff. 226 F.2d 204]. To the same effect is Danner v. Anskis (3 Cir. 1958) 256 F.2d 123, at 124, and cases cited in Pioche Mines Consol. and Pierce, supra. And, as heretofore noted, both the Bank Board [12 U.S.C. § 1464(d) (1)] and the Federal Savings and Loan Insurance Corporation [12 U.S.C. § 1725(c) (4)] are "sue and be sued" entities. The Long Beach Association is seeking declaratory relief on its Cross-claim in Action No. 63–1107, and 12 U.S.C. § 1464(d) (1) grants jurisdiction to this court in the plainest of language, and grants authority to the Association to sue the Bank Board in this District *"with respect to any matter under this section or regulations made thereunder, or any other law or regulation."* 12 U.S.C. § 1464(i) regulates conversion and dissolution of Federally chartered Savings and Loan Associations, such as Long Beach; and 12 U.S.C. § 1464(b) *provides for retirement of shares as provided in the charter of such an Association.* The Cross-claim of Long Beach is, therefore, a "matter under this section," i. e., Section 1464 of Title 12, United States Code.

 The Savings and Loan Commissioner and the Bank Board contend that this is an un-consented suit against the State of California, and that, hence, this court has no jurisdiction of the California Savings and Loan Commissioner under the Eleventh Amendment to the United States Constitution. They further contend that he is an indispensable party, and that the suit must therefore be dismissed. The California Savings and Loan Commissioner issued his order permitting the merger according to the Merger Agreement of June 12, 1963 *"subject to the lawful orders of any court of competent jurisdiction which may otherwise control the distribution of that number of said shares of guarantee stock of Equitable as to which the ownership and entitlement are in dispute."* He thus recognized that there was a dispute

and that that dispute could and should be settled by a court of competent jurisdiction. By the terms of the Order, no other sensible conclusion can be reached, except that when such a judgment is made, he will abide by its terms. There is no doubt but that the State of California has consented to such a suit as this one in this court. The matter is set at rest by the provisions of F.R.C.P. 17(b) which specifically states that the capacity to sue *or be sued* shall be determined by the laws of the State where the District Court is held, and by the California Financial Code, § 5258, which provides for judicial review of every official act of the California Savings and Loan Commissioner "in accordance with law." The text of Section 5258 is as follows:

" * * * Every order, decision, approval, certificate, license, permit, or the denial of any approval, certificate, license or permit, or other official act of the commissioner * * is subject to judicial review in accordance with law."

The fact that in other sections of the Financial Code of California, judicial review is limited to specified State courts [Section 9003—Superior Court; Section 7404—Supreme Court], whereas no such limitation is set forth in Section 5258, conclusively indicates that the review contemplated therein may be had in *any* court which otherwise has jurisdiction of the subject matter. Skokomish Indian Tribe v. France et al. (9 Cir. 1959) 269 F.2d 555, is thus not in point. As hereinbefore indicated, this court has jurisdiction of the subject matter, and by the above section of the California Financial Code, it has jurisdiction of the Commissioner. The Commissioner, in his order approving the merger, expressly consented to the determination "of any court of competent jurisdiction" as to the distribution of the stock "in dispute." Declaratory relief is a method of "judicial review in accordance with law." No specific consent is requisite to a suit for declaratory relief against public officials in California, designed to adjudge and declare the obligations of their Of-

fice. [County of Los Angeles v. State Dept. of Health et al. (1958) 158 Cal. App.2d 425, at 444, 322 P.2d 968, and cases cited therein.

The principle announced in 1839 in Clark et al. v. Smith, 13 Pet. 195, 38 U.S. 195, 10 L.Ed. 123, has never been modified or overruled, and has been re-affirmed and applied many times. The court there said (p. 202): "The State Legislatures certainly have no authority to prescribe the forms and modes of pro-ceeding in the courts of the United States; but having created a right, and at the same time prescribed a remedy to enforce it, if the remedy prescribed is substantially consistent with the ordi-nary modes of proceeding on the chan-cery side of the Federal courts, no reason exists why it should not be pursued in the same form as it is in the State courts." California Financial Code, § 5258 created both the right and provided the remedy by permitting judicial review.

The Eleventh Amendment does not permit a State official to divest one of rights federally granted or created. The rights of the shareholders in Long Beach were created by its Federally-granted charter. And a suit against an official of a State in such an instance (as is this) is not a suit against the State. [Reagan v. Farmers' Loan & Trust Co. (1894) 154 U.S. 362, 390–393, 14 S.Ct. 1047, 38 L.Ed. 1014; Sterling etc. v. Constantin et al. (1932) 287 U.S. 378, 393–394, 397–398, 53 S.Ct. 190, 77 L.Ed. 375; Ex Parte Young (1908) 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714]. The property having been de-posited in this court under the inter-pleader statutes, the Eleventh Amend-ment does not prevent the Federal court from declaring the rights and obligations of the parties, and enjoining the Califor-nia Savings and Loan Commissioner from interfering with such declared rights. [In re Tyler (1893) 149 U.S. 164, 13 S.Ct. 785, 37 L.Ed. 689]. The State having consented to suit against its Sav-ings and Loan Commissioner, it is unnec-essary to discuss the proposition as to whether he is an indispensable party or

a necessary party. Suffice it to say he is a proper party, and rightly so in this interpleader suit, equitable in nature, so that this court may finally and effectively dispose of the entire controversy which affects some 60,000 persons.

It is not necessary to name the Savings and Loan Commissioner person-ally as F.R.C.P. 25(d) permits a public official to be sued as a party in his official title rather than by name.

While the Court has already made findings and an order (December 12, 1963) that the Shareholders Protec-tive Committee and its members properly represent all the shareholders as a class, further comment is proper in view of the position of the Bank Board that such a Committee is not composed exclusively of persons who will benefit by the Bank Board's formula to create preferred class-es of shareholders and exclude other classes from any share of the distribu-table surplus. It is not necessary for a class action that the persons representing the class shall have the same rights as one another; they may have unequal rights, or, indeed, they may have conflict-ing rights, [Harris v. Palm Springs Al-pine Estates, Inc. (9 Cir. 1964) 329 F.2d 909] but still be of a class [Chance v. Superior Court of Los Angeles County et al. (1962) 58 Cal.2d 275, 23 Cal.Rptr. 761, 373 P.2d 849; Hink et al. v. Superior Court of Los Angeles County et al. (1962) 58 Cal.2d 921, 23 Cal.Rptr. 771, 373 P.2d 859]. Regardless of the amount of the deposit by any shareholder, or the date thereof, or whether or not the ac-count was pledged, the thing all share-holders have *in common is that they were depositors in Long Beach Federal Savings & Loan Association, under one common charter and one law authorizing the creating of the Association as a mutual institution, and received identical passbooks*. Here, there are 60,000 share-holders; obviously so numerous as to make it impracticable to bring them all before the court. Here, there has been the greatest possible notice to all the shareholders of the position taken by the Association and the Committee, including

a copy of the Complaint in Action No. 63–1072–PH, sent to each by mail, together with an order to show cause, fixing a time and place to object, if any one cared to object. One person showed up and objected, but has proceeded no further, and the Court must conclude that he is, and all the other shareholders are, content to have the matter adjudicated with the present parties, under the pleadings framing the issues. One Ross and several others showed up and asked that they represent themselves as intervenors rather than have the Committee represent them, but each asked the same relief sought by the Committee, i. e., pro-rata distribution of the distributable assets as provided by the Statute, the charter, and the Settlement Agreement. Except for the intervenors, not a single shareholder has appeared in this or any of the three actions objecting to either the position taken by the Shareholders Protective Committee or the individuals composing it, or the position taken by the Association. The only one who is objecting is the Bank Board, and it has and claims to have no pecuniary interest whatsoever in any of the property in custody of the court, which is the subject matter of this action and which belongs to the shareholders of Long Beach. F.R.C.P. 23 "does not require that all the members of the class be identically situated, if there are substantial questions either of law or fact common to all." [Harris v. Palm Springs Alpine Estates, Inc. (9 Cir. 1964) 329 F.2d 909–914]. And the fact that no investor is objecting is a factor to be considered. Here, in this case, where process would be required to be served on approximately 60,000 persons, or separate suits filed, it is most appropriate to heed the admonition contained in the last cited case (p. 913) that: "Indeed, it has been suggested that 'the ultimate effectiveness of the federal remedies' in this area 'may depend in large measure on the applicability of the class action device,' and particularly of the 'spurious' class action provided by Rule 23(a) (3)." While that case holds that it is a question of fact

to be tried, as to whether or not persons properly represent a class (with which there can be no quarrel), the undisputed facts related herein are sufficient for this court to form its judgment as a matter of law on the Motion for summary judgment. Moreover, it seems logical that "it is primarily for the shareholders" to determine what course they want to follow. [Denicke et al. v. Anglo-California Natl. Bank of San Francisco (9 Cir. 1944) 141 F.2d 285, Cert. den. 323 U.S. 739, 65 S.Ct. 44, 89 L.Ed. 592]. It cannot be overlooked that the Shareholders Protective Committee holds written proxies from more than a majority of the shareholders, and that all shareholders were advised of the position of the Shareholders Protective Committee and the Association, before the Merger Agreement was signed, and that the same Committee is and has been licensed by the State of California for 18 years, and that the Committee has participated on behalf of the shareholders in all of the long series of litigation and in the Settlement Agreement. I hold that the Shareholders Protective Committee properly represents all the shareholders as a class, under F.R.C.P. 23. In this connection, it must be kept in mind that the members of the Shareholders Protective Committee, and the intervenors are also suing *individually* as shareholders and depositors in the Association, and they have a right to have their individual rights declared, and in doing so, the court cannot escape the determination of the rights of all shareholders in order to determine the rights of one, so that any one not a party to this action could, under F.R.C.P. 71, enforce those rights "by the same process as if he were a party."

I come now to the controlling question set forth at the beginning of this Memorandum. I have read the briefs of the parties, and the cases cited. Most of the cases are wide the point. I am satisfied, and hold, that the Officers and Directors of the Association, and the Bank Board, or either of them, or the majority of the shareholders did not have the lawful power to alter the pro-

rata rights of shareholders from that set forth in the law, the charter, and the Settlement Agreement, and that the provisions of the Merger Agreement which attempt to do so are void.

 The Long Beach Federal Savings & Loan Association was created by the grant of a charter to it under the terms of what is now 12 U.S.C. § 1464. That statute provides that such Association shall be *"mutual,"* [12 U.S.C. § 1464(a)]; it requires that "[s]uch associations shall raise their capital only in the form of payments on such shares *as are authorized in their charter, which shares may be retired as is therein provided,"* [12 U.S.C. § 1464(b)]; it permits such Associations to lend their funds "on, the security of their shares" [12 U.S.C. § 1464(c)]; the Bank Board is given power to make rules and regulations [12 U.S.C. § 1464(d) (1)], and it is a proposition well established in the law that such regulations or rules or other action of the Board cannot be contrary to the Statute, or in excess of the powers granted by the Statute. As stated by the Supreme Court in Manhattan General Equipment Co. v. Commissioner of I.R.S. (1936) 297 U.S. 129, at 134, 56 S.Ct. 397, at 400, 80 L.Ed. 528:

> "The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law, for no such power can be delegated by Congress, but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity. Lynch v. Tilden Produce Co., 265 U.S. 315, 320–322, 144 S.Ct. 488, 68 L.Ed. 1034; Miller v. United States, 294 U.S. 435, 439, 440, 55 S.Ct. 440, 79 L.Ed. 977, and cases cited."

The Statute in 12 U.S.C. § 1464(i) provides for conversion to a State Association and dissolution by two methods: one, upon vote of not less than 51 per cent of the shareholders voting at a meeting specially called for that purpose, and the other, by negotiation which does not contemplate approval by vote of the shareholders. Inasmuch as the Board required approval by a vote of a majority of the shareholders at a meeting specially called for that purpose (Board Order No. 17,777 dated June 14, 1963—Exhibit 3–d–3), it must be concluded that the Board and the Association were proceeding under the provisions for merger and dissolution by vote of the shareholders [second unnumbered paragraph of 12 U.S.C. § 1464(i)], which does not require approval of the Board [Federal Home Loan Bank Board v. Greater Delaware Valley Federal Savings & Loan Association et al (3 Cir. 1960) 277 F.2d 437], and not under the provisions set forth in the third unnumbered paragraph of that sub-section upon such "equitable" basis as may be approved by the Bank Board. The second unnumbered paragraph of 12 U.S.C. § 1464(i), under which the conversion and dissolution is had, contains the *second* Congressional expression in the Statute as to the distribution of stock upon conversion and dissolution. It reads: "(6) *that, in the event of dissolution after conversion, the members or shareholders of the association will share on a mutual basis in the assets of the association in exact proportion to their relative share or account credits."* This provision is in addition to the specific requirement of subsection (b) *that the shares are to be retired as provided in the charter.* And the charter written, signed and issued by the Government requires a prorata distribution on dissolution.

 Several provisions of the charter issued to the Association by the Bank Board are pertinent. Section 9:

> " * * * All holders of share accounts shall be entitled to equal distribution of net assets, pro-rata to the value of their share accounts, in the event of voluntary or involuntary liquidation, dissolution, or winding up of the Association."

Section 3 of the charter provided that the Association has the power "to wind up and dissolve, merge, consolidate, or reorganize in the manner provided by law and rules and regulations made thereunder." The Bank Board contends that by the provisions in Section 3 of the charter, permitting dissolution "in the manner provided by law and rules and regulations made thereunder," gave the Board the power to make the disputed preferences and forfeitures "insisted" on by the Bank Board. The proposition that a special provision in a contract (and the charter is a contract not only between the Bank Board and the Association, but between each shareholder and every other shareholder—Dartmouth College v. Woodward, 4 Wheat. 518, 17 U.S. 518, 4 L.Ed. 629)—prevails over a general one, is so well known as not to require citation by authority. Any rule or regulation made by the Board (if it could be called a rule or regulation) for winding up or merger and dissolution thus cannot prevail over the specific provision in the charter and the statute that distribution shall be made pro-rata to shareholders in the event of dissolution. Especially is this so in view of the requirement that the Association shall be *mutual.* Article 16 of the charter provided that no amendment to the charter shall be made unless proposed by the Directors of the Association. Such directors never made any proposal to amend the charter so as to prefer any class of shareholders over any other, as "insisted" by the Board. Nor did the Bank Board.

▬▬ There can be no doubt but that the provisions "insisted" on by the Bank Board would prefer one class of shareholders over another, and destroy the mutuality of the shareholders, and this, without prior notice to those who deposited their money after April 22, 1960, or who pledged their accounts.

Title 12 C.F.R. 563.3 provides in its pertinent part:

"* * * *Every* share, membership, or deposit certificate, *passbook,* or other instrument evidencing a withdrawable investment hereafter *issued* by an insured institution, which pays or proposes to pay a different rate of dividends or interest upon different classes or shares or securities, *which prefers or proposes to prefer, either as to time or amount of participation in* earnings or *assets* (except by way of a bonus plan), *any one or more classes of shares or* securities, * * * *must,* unless the corporation (FDIC) specifically permits omission of one or more of such recitals, *include in its provisions, and display in easily read* type, a full and understandable statement of the *method* * * * *or the dividend provisions, or both, under which the institution operates, and* the *charge* or charges, if any, *for* the *privilege* of becoming, remaining, *or ceasing to be a saver or investor in the institution.*"

All depositors, at all times before as well as after April 22nd, 1960, were issued an identical passbook, the text of which was approved by the Bank Board. *Nothing* is said in the passbook, and indeed, no notice was given to any shareholder at the time he deposited his money, whether in the sum of one hundred dollars or one million dollars, or at, or before he pledged his account, that any depositor who pledged his account would forfeit his right to share pro-rata with all others, or that if the deposit was in excess of $10,000.00, he would forfeit his pro-rata share. The Bank Board are bound by their own regulation, unless changed in the manner prescribed by the Administrative Procedure Act [5 U.S.C. § 1003]. The above-quoted regulation has never been changed. The Bank Board cannot ignore this regulation. [Service v. Dulles et al. (1957) 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403; United States ex rel. Accardi v. Shaughnessy (1954) 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681]. Furthermore, all depositors were given, or had made available to them, an identical copy of the charter which, as above indicated, calls for pro-rata distribution, and which, it is worthy

to repeat, constituted a contract by each shareholder with every other shareholder.

In addition to the charter provision for pro-rata distribution upon dissolution, the provisions of the Settlement Agreement dated February 14th, 1962, are important. That Agreement was about two years in the process of negotiation. Article XV thereof devotes six pages to the matter of the proposed merger of Long Beach with Equitable and its dissolution. It is not denied that throughout the negotiations the Bank Board unsuccessfully attempted to get the officers of Long Beach to limit accounts which would come in after the return of Long Beach to its elected management. But the Agreement contained the following provisions with relation to distribution of surplus or net assets on dissolution:

"XV(h)—After the assumption by Equitable of said aggregate principal amount of all Long Beach share accounts and after the payment or the making by Long Beach of provision for payment of all creditor and other liabilities, the net surplus, reserves and undivided profits of Long Beach shall be distributed as and when available to Long Beach shareholders of record at the close of business of the date (herein called 'Approval day') on which such plan shall be approved by the members of Long Beach as follows:

"(i)—Each such shareholder shall be entitled to such part of the amount of such distribution as the dollar value in principal of his share account at the close of business on Approval Day bears to the total dollar value in principal of all Long Beach share accounts at the same time (not including said adjusting dividends in the computation). Each such shareholder shall be given written notice of his proportionate share as soon as practicable after Approval Day.

"(ii)—Such distribution shall be made from time to time, as directed by the Long Beach Directors subject to the next following sub-paragraphs (iii), (iv), (v), and (vi), until the total net surplus, reserves and undivided profits and any other remaining assets of Long Beach have been collected, converted into cash, and distributed according to such plan."

The Settlement Agreement thus followed the terms of the charter. It incorporated the entire agreement of the parties. It was relied upon by the subsequent action of the Long Beach Association and its shareholders in dismissing the many actions therein mentioned, and by Equitable. If the doctrine of estoppel has any place in this case, it is more properly invoked in favor of the Association and its shareholders, rather than against them.

■■■ The Government's assertion that Mr. Gregory, President of Long Beach, orally promised to "screen" the accounts is denied by Mr. Gregory, but it is immaterial whether it is true or not as Gregory had no such power.

■■■ The Order of the Bank Board of March 22, 1962 (No. 15681) made pursuant to Article XI of the Settlement Agreement, provided specifically that: "(3) All rights, powers and privileges of said Association's members, officers and directors are restored." No restriction of any kind was placed on securing new "members" (shareholders), and it thus follows that any one who became a member or shareholder after the return of the Association had exactly the same rights as every other previous member. They were issued a passbook approved by the Bank Board, which was identical to all previously issued passbooks.

The Government asserts that every Federally chartered Association takes its charter subject to any changes that may be made by law. What Congress can do is one thing, but what the Bank Board can do is quite another. The changes here "insisted" on by the Bank Board were not by Congress, but by the Bank Board, and were, in fact, contrary to the

Statute, to the charter issued by the Bank Board, its own Settlement Agreement, and contrary to its own regulations.

▉ The Statute provided for the Association to be a *mutual* Association, and in a mutual Association preference cannot be given to one depositor or shareholder over another. In Intermountain Building & Loan Ass'n et al. v. Gallegos et al. (9 Cir. 1935) 78 F.2d 972, at 980, the Court said: "The pledge of the assets of a building association for the retirement of a certain class of its stock, in preference to others, is so violative of the elementary requirements of equality and *mutuality* as to be absolutely void." (Emphasis added).

In Pacific Coast Savings Society v. Sturdevant (1913) 165 Cal. 687, 133 P. 485, 49 L.R.A.,N.S., 1142, the California Supreme Court had occasion to comment on the overriding necessity of equality of treatment to depositors or shareholders in a mutual institution. It said, at page 692, 133 P. at page 487:

"* * * we think the better view is that followed by the court below, namely, that when the corporation becomes insolvent all stockholders, including those who have given notice, pursuant to the by-laws, of withdrawal, stand upon an equal footing. The theory upon which this view is to be sustained is well stated in the following quotation from Endlich on Building Associations (2d Ed.) § 514: 'The truth is that there is implied, in the very essence of the building association scheme, an agreement between the members of every association, in the light of which all other agreements and all rules and by-laws must be read, and to which they must be conformed; and that is the agreement that all burdens shall be equally borne, as well as all profits equally shared— that the whole enterprise shall be conducted and the rights and obligations of the participants in it shall be adjusted on a basis of strict mu-

tuality, equality, and fairness. To permit one member, or one set of members, to be paid in full at the expense of others who get less, is not to carry out that scheme or agreement, unless there is something which gives the former an equity superior to the latter, whereby they have a better and stronger claim upon the property of the association. Where one has subscribed to and paid up stock upon a distinct understanding that it is to be preferred over others that have paid less, there is such a superior equity. But there is nothing in the mere fact that one has given a certain number of days' notice that he wants his money, whereby he is, ipso facto, invested with an equity to receive it superior to that of one who has not given such notice. There is therefore nothing to counter-balance, much less outweigh, the inequitableness, of permitting him to take the fund belonging to his fellows in order to pay himself.' And the learned author goes on to quote with approval the following declaration of the Supreme Court of Pennsylvania in Christian's Appeal, 102 Pa. 184, 189: 'When a building association has failed to fulfill the objects of its creation and has become hopelessly insolvent * * after expenses incident to the administration of its assets are deducted, the general creditors, if any, should be first paid in full, and the residue of the funds should be distributed, *pro rata*, among those whose claims are based upon stock of the association, whether they have withdrawn and hold orders for the withdrawal value thereof or not.'"

▉ And while the charter may be subject to changes by Congress, in the public interest, there are limitations in that respect also. In Treigle v. Acme Homestead Ass'n (1936) 297 U.S. 189, 56 S.Ct. 408, 80 L.Ed. 575. The Court had under consideration a statute of Louisiana which attempted to alter the

rights of previously existing shareholders in the proportion to be paid to them. The Court held it void, and said, at page 196, 56 S.Ct. at page 411:

"The provision is comparable to a statute declaring that whereas preferred stockholders heretofore have enjoyed a priority in the distribution of assets, in that respect they shall hereafter stand *pari passu* with common stockholders. Such an interference with the right of contract cannot be justified by saying that in the public interest the operations of building associations may be controlled and regulated, or that in the same interest their charters may be amended. The statute merely attempts, for no discernible public purpose, the abrogation of contracts between members and the association lawful when made. This cannot be done under the guise of amending the charter powers of the corporation."

See Also: Huntington v. Savings Bank (1877) 96 U.S. 388, 24 L.Ed. 777; Hamilton Natl. Bank v. District of Columbia (1946) 81 U.S.App.D.C. 200, 156 F.2d 843–846.

■ The provisions "insisted" on by the Bank Board not only are contrary to the Statute, the charter, the Settlement Agreement and their own regulations, but they also violate the private contracts made by the shareholder with the Association when such shareholder pledged his account. Numerous regulations of the Bank Board implement the provisions of 12 U.S.C. § 1464(c) permitting shareholders to borrow on the security of their shares. All the loans which would be affected by the Bank Board's "insisted" provisions, were made long before the Bank Board ever asserted the right to penalize such borrowers by cutting them out of any distribution of the surplus. The form for assignment of the passbooks for the purpose of pledging such account for loans was prescribed by the Board. The Board cannot now ignore it, and alter the mutual obligations between the borrower and the Association by penalizing the borrower simply because he borrowed.

■ The Government contends that in the event the court does not agree with its position, the court must remand the matter to the Bank Board. The position is not well taken for the reason that the action of the Bank Board, being out of harmony with, and contrary to, the law, the charter, the Settlement Agreement, and the Bank Board's own regulations, is a nullity. [Manhattan General Equip. Co. v. Commissioner I. R. S., supra]. Hamilton Natl. Bank v. District of Columbia (1946) 81 U.S.App.D.C. 200, 156 F.2d 843, quoted with approval Manhattan General Equip. Co. v. Commissioner, supra, but remanded the case to the local taxing authorities to carry out their judgment. In that case a remand was required to permit ministerial acts of tax calculations. Here, there is nothing to remand.

■ The contested provisions of the Merger Agreement are either in compliance with the law or they are not. It is my opinion that they are not and that they are a "mere nullity." The Bank Board proposed the language, and agreed to the insertion of the provision that the validity of *any part* of the Agreement could be contested. It was notified, in advance of its approval of the Merger Agreement, that the Association and the Shareholders Protective Committee were going to contest the validity of the disputed provision of the Agreement, and that probably Equitable would file a suit in interpleader. The Bank Board nevertheless approved the Merger Agreement with the provision permitting legal testing of *any part* thereof, and *thereafter notified the parties to the Agreement and the Savings and Loan Commissioner of the State of California that its Resolution No. 17,177 [Exhibit 3(d) (5)] approving the Agreement was "satisfied."* In reliance upon the provision of the Merger Agreement permitting legal testing of any part of it, and in reliance upon the notification that its Resolution

approving the Agreement was "satisfied," the parties proceeded to and did complete the merger, and immediately filed the suits to contest the validity of the disputed provisions of the Agreement.

The only sensible conclusion one can reach is that, like the California Savings and Loan Commissioner, the Bank Board agreed to be, and is, bound to abide the judgment of a court of competent jurisdiction. This court is a court of competent jurisdiction. It has jurisdiction of the subject matter and the parties, and there is nothing further the Bank Board can do even if the matter were remanded.

This is not a case for review of the rule-making power under 5 U.S.C. § 1003; and it is not a case under 5 U.S.C. § 1004 concerning adjudicatory powers, as there was no hearing, no findings, just the order of the Bank Board and its admitted "insistence" on having the objected-to provisions in the Agreement. It is somewhat analogous to the action of the Secretary of the Interior in striking an Indian's name from the allotment list and cancelling the certificate which had theretofore been issued. The Supreme Court required the restoration of the name to the rolls and the restoration of the certificate by mandamus. But here, there is nothing to mandamus. Nevertheless, the comments of the court are pertinent. It said—Garfield v. United States (1908) 211 U.S. 249, at page 262, 29 S.Ct. 62, at page 66, 53 L.Ed. 168:

"In our view, this case resolves itself into a question of the power of the Secretary of the Interior in the premises, as conferred by the acts of Congress. We appreciate fully the purpose of Congress in numerous acts of legislation to confer authority upon the Secretary of the Interior to administer upon the Indian lands, and previous decisions of this court have shown its refusal to sanction a judgment interfering with the Secretary where he acts within the powers conferred by law. But, as has been affirmed by this court in former decisions, there is no place in our constitutional system for the exercise of arbitrary power, and, if the Secretary has exceeded the authority conferred upon him by law, then there is power in the courts to restore the status of the parties aggrieved by such unwarranted action."

In Miller v. United States (1935) 294 U.S. 435, at page 440, 55 S.Ct. 440, at page 442, 79 L.Ed. 977, the court stated: "The only authority conferred, or which could be conferred, by the statute is to make regulations to carry out the purposes of the act—not to amend it." Here, the purpose of the Act is to establish *"mutual"* building and loan associations, the shareholders or depositors of which should stand *equally* in all rights. The provisions "insisted" on by the Bank Board do not do that, but create retrospective and retroactive classes of shareholders, and give them preference over others whose rights are illegally forfeited. And this without any previous notice and contrary to their own regulations and the terms and intent of the Statute.

■ While I am satisfied that there is no genuine issue as to the fact that the shareholders ratified the Merger Agreement in reliance upon the right and the declared purpose to bring legal proceedings to enforce pro-rata distribution, if that conclusion were not warranted, and if, as contended by the Bank Board, the 64.4 per cent of the eligible shareholders voted to approve the Merger Agreement in reliance on the preferential treatment for certain classes as "insisted" on by the Bank Board, such provision in the Agreement would nevertheless be void. This, for the reason that the majority stockholders cannot appropriate a minority shareholders' interest in property belonging to a corporation, to the detriment of minority stockholders. [Lebold et al. v. Inland Steel Co. (7 Cir. 1942) 125 F.2d 369, Cert. den. 316 U.S. 675, 62 S.Ct. 1045, 86 L.Ed. 1749]. See also: Southern Pac. Co. v. Bogert et al. (1919) 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099;

Pepper v. Litton (1939) 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Jackson v. Ludeling (1874), 21 Wall. 616, 88 U.S. 616, 22 L.Ed. 492.

I conclude that neither the majority of the shareholders, nor the officers and directors of Long Beach, nor the Bank Board, nor Equitable, acting singly or in concert, had the power to make the forfeitures and preferences as set forth in the contested provisions of the Merger Agreement; that such provisions are void, as a matter of law; that no remand is required to be made to the Board; and that all shareholders, regardless of the size or date of deposit and regardless of any pledge of their shares, are entitled to a pro-rata distribution of the distributable surplus of the Long Beach Association.

The Bank Board relies heavily on Fahey v. Mallonee (1947) 332 U.S. 245, 67 S.Ct. 1552, but that case involved the right of the Bank Board to appoint a conservator to take charge of the entire assets of the Association, and did not in any way involve the taking of one shareholder's property and money, and giving it to another, as the Bank Board attempted to do here.

In Reich et al. v. Webb et al., decided August 18th, 1964, 336 F.2d 153, the Ninth Circuit said, as to one of the holdings in Federal Home Loan Bank Board v. Greater Delaware Valley Federal Savings & Loan Association (3 Cir. 1960) 277 F.2d 437: "Basically the holding stands for nothing more than a declaration that substantive liability cannot be created by the Bank Board apart from statute, a proposition with which we fully agree." In this case, the provisions in the Merger Agreement "insisted on" by the Bank Board attempt to create substantive liability against all those whose deposits exceed $10,000.00, or who have pledged their stock for loans, and in favor of all those who do not fall within those categories.

The Bank Board claims the plaintiffs and cross-complainants and intervenors are estopped from challenging the validity of the disputed provisions. This is not so for several reasons: first, the Board proposed the language in Article VII to the effect that any shareholder could contest the validity of the Agreement or any part of it, and the Association and the shareholder, in their meetings, relied upon that proposal by the Board and acted on it. So did the Savings and Loan Commissioner of the State of California. Secondly, the Association did nothing to induce the Bank Board to put the disputed provisions in the Agreement, but by admission of defendants, the Bank Board "insisted" on the disputed provisions, and consented to the provision permitting a suit to test the validity of the Merger Agreement "or any part thereof." And the law does not prevent a shareholder from accepting such benefits as may be accorded him by a dissolution or merger, and also from suing for what he claims is his lawful right to have. [Lebold et al. v. Inland Steel Co. (1943) 125 F.2d 369, Cert. den. 316 U.S. 675, 62 S.Ct. 1045].

The parties have filed affidavits and counter-affidavits ranging over a wide field of facts and conclusions other than covered and found herein. But none of such facts in said affidavits and counter-affidavits, other than as stated herein, are necessary or material to a decision of the whole case, and the facts as stated herein are material and without any genuine issue, and are all that are material or necessary to a decision that the plaintiffs, cross-complainants and intervenors are entitled to the judgment herein indicated that the disputed provisions in the Merger Agreement are illegal and void, and that the action of the Bank Board in "insisting" on them as a condition of the merger was arbitrary and contrary to, and without authority in, law.[4]

---

4. Because the Court has had some difficulty in following the positions of the Bank Board, some comment should be made with relation thereto: A decision thereon is not necessary to the conclusions reached here. It is claimed that the Board "insisted" on the provisions because of their "concern" over the flow

While this Memorandum is primarily addressed to Action No. 63–1107–PH, a further examination of the pleadings and Motions for summary judgment in Cases No. 63–1072–PH (to which Equitable has consented to be a party, and for which an order will be signed when presented), and No. 63–1230–PH, demonstrates that the facts found herein as material to a decision of the whole case are true, without any genuine issue thereto, and the legal conclusions herein stated are equally applicable to and controlling as to each of said latter numbered cases, without further findings, conclusions, or discussion.

Pursuant to the provisions of F.R.C.P. 52, the findings of fact and conclusions of law stated herein are sufficient so as not to require any findings of fact or conclusions of law in any of the three cases.

Counsel for the prevailing parties will prepare, submit, and serve judgments in

---

of money into the Association in large deposits after its return on April 2, 1962. But the Affidavit of Professor McMurray, former Chairman of the Bank Board, shows that in July, 1962, when they first demanded exclusion of accounts of $100,-000.00 and over, their "concern" *was not over* the *inflow* of funds, *but* over the *outflow* of money from the institution. His affidavit states:

"In July, 1962, during the merger negotiations, the Long Beach management advised the Bank Board that approximately $7,000,000 had been *withdrawn* from the Association after the June 30, 1962 dividend. *The Board became concerned about this situation.*" [Paragraph 6 of the Affidavit]. (Emphasis supplied).

The Board insists that the large deposits "diluted" the share of surplus which would go to the small depositors. It is unnecessary to decide that, but it is worthy of note that several hundred of the accounts, whose right to share would be forfeited because they were pledged, are for less than $500.00, and that the 42 million dollars additional deposits which were in the institution on December 31, 1962, gave the Association a decided tax advantage in enabling it to write off, under the then existing laws, 12½ per cent of that amount, viz.: more than five million dollars, as bad debt reserve. And five million dollars contributing to a tax shelter is not tiddlywinks. The Bank Board contends that Equitable did not offer three million dollars for the good will of Long Beach because the good will of Long Beach was not worth that much. This, in the face of the affidavit of Mr. Palmer, an officer of Equitable, who sat through all the negotiations, and in the face of the uncontroverted offer of Equitable at the shareholders' meeting of April 27, 1963, to pay three million dollars as a bonus for the good will of Long Beach. Whether this is so or not is unnecessary to decide.

Throughout the merger negotiations and since these suits were filed, the position of the Bank Board is precisely contrary to the public statements of Professor McMurray as Chairman of the Board (now resigned) which reflected an almost trapezical agility to shift, depending on whether or not he was talking to a Congressional Committee, to the public, or to Long Beach Federal. Professor McMurray testified that all Federal mutual depositors share alike on dissolution, whether they have been in the system one year, ten years, or 20 years, when he appeared before the House Committee on Appropriations on January 24, 1963. And on May 7, 1963, he testified before the House Committee on Banking and Currency that all depositors in Federal mutuals were treated alike, whether $100.00 or $100,000.00, and whether pledged or not; and in a public speech in New Orleans on March 2, 1964, he again emphasized the necessity for *equality* of treatment in Federal mutuals.

The Bank Board seems to base its position on the fact that pro-rata distribution will hurt the little account and help the big one. At the Court's suggestion, a tabulation was made of the accounts in different amounts which would be deprived of sharing in the distributable surplus if the Board's formula were applied. It is Exhibit 13 attached to the Motion for Summary Judgment of Plaintiffs and Cross-complainants. It shows a total of 1,899 accounts affected. Of that number, 1,000 are less than $10,000.00; 324 are $500.00 or less; 1524 are $11,-000.00 or less; and only 54 are $100,-000.00 or over. Thus, the greater number of small account shareholders are punished by the attempted deprivation than the larger shareholders. As heretofore stated, none of these facts are material to the decision reached.

each of the three cases in accordance with the conclusions and decisions herein expressed. If not too much of a burden, it would be preferable to spell out in the judgments the exact amount of each shareholder account (using a code number) and the exact amount of shares in Equitable to which that account is entitled.