Charles K. CHAPMAN and Margaret O. Chapman, Plaintiffs,

v.

UNITED STATES of America, Defendant.

UNITED STATES of America, Counterclaimant,

v.

Charles K. CHAPMAN and Margaret O. Chapman, Plaintiffs.

Civ. No. 67–335.

United States District Court, C. D. California.

June 5, 1970.

**550**

[For related cases see footnote 1, 233 F.Supp. 578.]

Robert L. Meyer, U. S. Atty., Charles H. Magnuson and Mason C. Lewis, Asst. U. S. Attys., Los Angeles, Cal., for the United States.

Charles K. Chapman, Long Beach, Cal., for plaintiffs.

## MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT

HALL, District Judge.

The plaintiffs, husband and wife, by their Complaint filed March 6, 1967, seek a refund of some $411,000 income taxes. The Government has filed a counterclaim seeking additional income taxes from the plaintiffs.

These matters arise out of the so-called Long Beach Federal Savings and Loan "seizure litigation" which began in May 1946 when the federal government acting through one of its agencies, seized the Long Beach Federal Savings and Loan Association. It is unnecessary to state here all of the litigation which has intervened in the meanwhile except to say that this is the last suit of many, some of which have been constantly pending until recently before this court since May 1946.

The pleadings herein are long, complex and complicated, but the nub of the controversy involved herein is whether or not $504,000 received by Chapman in 1962, for which he executed a series of promissory notes agreeing to repay the same at interest of 1¼% per annum and upon which he has paid interest to Long Beach Federal or its successors in the approximate amount of $50,000, was a loan or a payment.

The other sums of money involved and issues concerning the same such as whether or not money advanced as costs is taxable, depend in one degree or an-

other upon the resolution of that question.

The plaintiffs have filed a motion for summary judgment on that issue and assert that they are entitled to summary judgment on the ground of *res judicata* because after notice, hearing and trial on the matter of allowance of attorneys' fees, a judgment was made by this court in cases Nos. 63–1072, 63–1107 and 63–1230, as evidenced by a Memorandum and Order on Attorneys' Fees, holding that the receipt by Chapman of said $504,000 was a loan and not a payment, but that it had a present worth of $109,527 on the date of its receipt, November 15, 1962. A copy of that Memorandum and Order is appended hereto, incorporated herein, and made a part hereof.

In support of plaintiffs' motion for summary judgment the plaintiffs incorporate all of the pleadings and files and records in the above-mentioned and related cases and the transcript of testimony of the witnesses taken.

While the parties have extensively briefed the application of the doctrine of *res judicata* in this case, it is unnecessary for the court to determine that issue on this motion for the reason that the plaintiffs are entitled to a summary judgment because there is no genuine issue as to any material fact and the plaintiffs are entitled to a summary judgment as a matter of law due to the fact that said $504,000 was a loan and not a payment, that it had a present value of $109,527 on the date of its receipt in November 1962, and was taxable income to that extent only.

As above indicated, all of the pleadings and records in the last three mentioned cases, as well as many others involving the general litigation, were incorporated in the motion, but of particular importance is the fact that the plaintiffs in this case incorporated all of the testimony which was taken on the matter of attorneys' fees in the last above-mentioned three cases. The two parties who knew most about the action were Thomas A. Gregory of Long Beach Federal Savings and Loan Association at the time of the $504,000 transaction and Mr. Charles K. Chapman. They both testified. Mr. Gregory is now dead. An Affidavit to that effect is in the file and an Affidavit by Mr. Chapman that the statements he then made under oath on the witness stand with opportunity for cross examination by Government counsel were true. The Government has come up with absolutely no statement of any material fact or affidavit or anything in opposition to the plaintiffs' motion for summary judgment except that the matter has never been judicially determined "against the Commissioner of Internal Revenue or against anyone else," and that the Government "would wish to have this question of fact decided by a jury.

Rule 56 of the Federal Rules of Civil Procedure specifically provides that:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

And Local Rule 3(g) (3) provides that where a motion for summary judgment is made and properly supported, if any facts are controverted they must be controverted by affidavit; and Rule 56, F.R.C.P., provides that:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

The defendant United States has filed no such affidavits.

As recently stated by the Ninth Circuit in Chapman v. Rudd Paint & Varnish Co. (9 Cir. 1969), 409 F.2d 635:

"[14, 15] When a motion for summary judgment is made and supported as provided in Rule 56, an adverse party may not rest upon the mere allegations or denials of his pleading. As stated in Rule 56(e), his response by affidavits or otherwise must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if otherwise appropriate, shall be entered against him. See First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569. One against whom a motion for summary judgment is filed is therefore under a duty to show that he can produce evidence at the trial, and is not entitled to a denial of that motion upon the unsubstantiated hope that he can produce such evidence at the trial. International Longshoremen's and Warehousemen's Union v. Kuntz, 9 Cir., 334 F.2d 165, 169, n. 5."

See also Gifford v. Travelers Protective Assn. (9 Cir. 1946), 153 F.2d 209; Byrnes v. Mutual Life Insurance Co. of New York (9 Cir. 1954), 217 F.2d 497; Radio City Music Hall Corp. v. United States (2 Cir. 1943), 135 F.2d 715; Perma Research and Development Co. v. Singer Co. (2 Cir. 1969), 410 F.2d 572; and a case which is particularly applicable here, Rinieri v. Scanlon (S.D.N.Y. 1966), 254 F.Supp. 469, where the court stated:

" * * * [T]he opposing party's facts must be material, and of a substantial nature, not fanciful, frivolous, gauzy, nor merely suspicious."

and that such facts must be those which may or would entitle the opposing party to judgment, "or refute the proof of the moving party in some material portion,"

and that "This is all the more true where, as here, the opposing party has had an opportunity to examine the moving party at length under oath."

There can be no doubt but that the United States Attorney by a Deputy United States Attorney and Assistant Attorney General were present at the hearing on the testimony given by Gregory and Chapman and others on the matter of the attorneys' fees and had an opportunity to cross-examine both of them thoroughly at that time. They developed no facts at that time. They did not then produce any witnesses or evidence of any kind or nature or documents although given ample opportunity to do so and have not done so in this case although it has been pending since March 6, 1967, and interrogatories by the plaintiffs to the defendant have gone unanswered.

The court concludes that there is no genuine issue as to material facts set forth in plaintiffs' moving papers and, as a matter of law, that the $504,000 transaction between Long Beach Federal and Mr. Chapman in November 1962 constituted a loan and was not a payment; that it did have a then present cash value to Mr. Chapman of $109,527 as taxable income as of the date of the loan, and that the money paid by Mr. Chapman as interest was actually paid and received by the parties to whom it was paid as interest and that the plaintiffs are entitled to have said interest deductions made in the year they paid them.

It is thus not necessary to reach the question of *res judicata*, and the plaintiffs are entitled to a summary judgment to the foregoing effect which would necessarily mean that the plaintiffs are entitled to summary judgment on the defendant's counterclaim for additional taxes.

There are other matters involved but the court feels that these matters can be worked out between the parties within the next thirty days. If they cannot do so, the court will then entertain such mo-

tions as the parties may deem appropriate, and at that time will make findings of fact, conclusions of law and enter judgment.

## APPENDIX
### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA
### CENTRAL DIVISION

Sidney ELLIOTT et al.,
               Plaintiffs,

v.

FEDERAL HOME LOAN BANK BOARD et al.,
      Defendants, (two cases)

No. 63–1072–PH

EQUITABLE SAVINGS AND LOAN ASSOCIATION,
               Plaintiff,

v.

Sidney ELLIOTT et al.,
             Defendants.

No. 63–1107–PH

No. 63–1230–PH

MEMORANDUM AND ORDER
ON ATTORNEYS' FEES

(Filed July 25, 1966)

———◆———

HALL, District Judge.

Two of the above actions were filed on September 10, 1963, the effective date of the merger of Long Beach Federal Savings and Loan Association, a federally chartered institution, into Equitable Savings and Loan Association, a California stock organization. The other one was filed September 17, 1963 and transferred to this court.

As a result of the merger, a block of 791,650 shares of Equitable stock on the date the merger was consummated, viz., September 10, 1963, was available for distribution to Long Beach depositors as *surplus, bonus,* or *net value,* of the Long Beach Association. That is to say,

Equitable agreed to assume the liability to each depositor of Long Beach for the total amount of each deposit, as well as all liabilities of Long Beach, and to distribute to the depositors [1] collectively 791,650 shares of its stock.

All of the suits, in effect, sought the same relief, viz., to have said 791,650 shares of Equitable Association's stock deposited in court, distributed according to the terms of the *statute,* the *by-laws* of Long Beach, the *Settlement Agreement* of February 14, 1962, and the *passbooks* issued to the shareholders of Long Beach, share and share alike rather than an unequal distribution "insisted" upon by an imprimatur of the Bank Board. Motions

---

1. The market value at merger time of the total block of 791,650 shares was between $9,250,000 and $9,500,000 or about $12 per share. The market value on the dates of the hearings (June 1965) on the within motions was between $5 and $6 a share. The book value on the latter date was approximately $8 per share.

by each party for summary judgments were consolidated and plaintiffs' motions were granted. See Elliott v. Federal Home Loan Bank Board, D.C., 233 F. Supp. 578 for the court's opinion. Judgment on that opinion, which also served as findings of fact and conclusions of law, was made and entered May 17, 1965.[2]

On March 23, 1965, Charles K. Chapman, who represented the Long Beach Federal Savings and Loan Association since the inception of the litigation involving the Long Beach seizure, twenty years ago in May 1946, and George W. Trammell, who represented the Shareholders' Protective Committee of the shareholder-depositors of Long Beach Federal Savings and Loan Association from 1960 (following Wyckoff Westover who died in 1956 and others who had previously represented them), filed a joint Petition and Motion for Partial Allowance on Account of Attorneys' Fees.

The Petition sought fees only to the date (October 29, 1963) of the consented judgment for partial distribution of 700,000 of the total shares on deposit in court, but at the suggestion of the court the application was expanded to include services to and including the entry of judgment by this court in the within cases on May 17, 1965 (not including any appeal or services of any kind after May 17, 1965).

Due notice of the motion was given by first class mail to all of the shareholder-depositors of Long Beach and all counsel involved. The motion came on for hearing, and was heard by this court on June 22, 23, 24 and 25, 1965. Nobody appeared in opposition to the application for attorneys' fees except the Government agencies represented by Government counsel. One shareholder, who had long since withdrawn his funds and who was entitled to receive approximately 50 shares of Equitable stock, appeared and said he objected, but he offered no testimony or evidence of any kind and did not remain for the hearing. *What* he "objected" to is still not of record or disclosed to this court. But among 60,000 shareholders it is only normal that you must expect at least one objector. The Government agencies appearing in the case offered no testimony or evidence of any kind and did nothing more than cross examine the witnesses who were produced by the petitioners. The petitioners produced evidence, oral, documentary, and factual, as well as expert opinion testimony. At the conclusion of the hearing the matter was submitted.[3]

In addition to the original petition and motion for partial allowance of attorneys' fees, the petitioners filed a 128-page Affidavit reciting their services. No affidavits countering that Affidavit were filed. Upon stipulation of counsel, approved by order of the court, that Affidavit was admitted in evidence as the direct examination of Mr. Chapman and Mr. Trammell.

It is unnecessary to repeat here either the facts set forth in that Affidavit or the recitations which this court has made in previous opinions of the long history of this litigation except to say that it began 20 years ago in May 1946 by the seizure, without notice, of the Long Beach Federal Savings and Loan Association, which resulted in much litigation concerning that seizure as well as the seizure and dissolution (also without notice) of the Los Angeles Bank of the Federal Home Loan Bank Board. One threatened seizure was later enjoined, and another one occurred in 1960, also without notice. All of these seizures were marked by bitterness, refusal of the Government officials to give receipts for cash and other negotiable securities, multi-million dollar runs of withdrawals

---

2. The lapsed time between the date of the opinion, September 22, 1964, and the date of the judgment, was occasioned by the immense amount of calculations required on approximately 60,000 share accounts of Long Beach.

3. An intervening tour of duty on the criminal calendar of this court prevented attention to this matter until now.

by depositors, constant, varied and seemingly continuous and interminable litigation,[4] and three congressional investigations resulting in reports covering *several thousand* printed pages, and also resulting in drastic changes in the law.

The picture seemed somewhat to brighten in the early part of 1962, when, on February 14, 1962, a Settlement Agreement was entered into between the Long Beach Federal Savings and Loan Association and the Federal Home Loan Bank Board which called for dismissal of all litigation and what amounted to payment of $5,000,000 in damages to the Long Beach Association, and the *approval* of a *merger* between the *Long Beach Association and the Equitable Savings and Loan Association.* Due to the many complications involved, it took some time to implement that agreement. This court, in the exercise of its duty, deemed it necessary to notify by publication and direct mail all the depositors and shareholders of Long Beach, which entailed a tremendous job of printing and mailing. The Settlement Agreement was finally approved (the appearances in opposition to it were less than five, and none of them offered any ground), and on April 2, 1962 the Association was returned to its original management.

According to the uncontradicted evidence before the court, Attorneys Chapman and Trammell had in the meanwhile, since 1958, been working together with the officers of both the Long Beach Association and the Equitable Association looking towards a merger of Long Beach into Equitable. Arrangements for the financing, up to $5,500,-000, for the conversion and merger of Long Beach into a State association had been completed, and the State examiners were in the Long Beach Association conducting the audit required for such conversion when the Board again, in April 1960, seized the Association, without hearing or notice. The financing withdrew when the April 1960 seizure took place, which required everybody to start over again on merger plans. A merger between Long Beach and Equitable was approved in the Settlement Agreement. But, according to the uncontradicted testimony, within about six weeks from the date the Association was returned (April 2, 1962), the Federal Home Loan Bank Board attempted to renege on their approval of the Settlement Agreement and began to throw obstacles in the way of any merger. The Board, in absolute contradiction to the specific terms of the Settlement Agreement, insisted on other than pro-rata distribution of surplus of Long Beach. Another congressional investigation followed and, according to the uncontradicted testimony, it required the almost daily services of Attorney Chapman to be in contact with the changing phases of the merger and the numerous resulting problems encountered, such as, for instance, increasing the capitalization of Equitable in order to be able to receive Long Beach in a merger, repeated drafting and redrafting of the merger agreement, the supervision of accounting, securing of appraisers, a thorough examination of tax consequences, stockholders' meetings, drawing proxies, and many others,[5] which, as above stated, compelled the almost constant attendance and advice of Attorney Chapman, and the occasional advice and contact of Attorney Trammell representing the shareholders, in order to ef-

---

4. There were 27 cases in the Federal court, and 11 in the State court, and more than 450 pages of docket entries. Aside from the many unreported findings and orders, more than 400 pages are required in the official printed volumes of reports to cover the many opinions written involving this litigation. About 200 pages were written by me and it is unnecessary to repeat them or even summarize them. To grasp the scope and complexity of this litigation or the extent of petitioners' services one should read *all* the *reported* opinions, at least.

5. Illustrative of how wide-ranging counsel's services were, was his participation in the conversion of Bellflower Savings & Loan into a California State association, and then its merger with Equitable, as part of the ultimate plan in merging Long Beach and Equitable.

fectuate the merger agreement which was finally executed under date of June 12, 1963, more than a year after the Association had been returned, and was effected on September 10, 1963.

The three instant suits are the result of disputes which arose during the course of the merger agreement concerning the insistence by the Bank Board, contrary to the Settlement Agreement, it executed, first, to eliminate from any share of the surplus all depositors of more than $100,000 after the April 22, 1960 seizure, and their subsequent "insistence" to eliminate from any share of the surplus those having more than $10,000 on a new deposit after April 22, 1960, as well as every shareholder, regardless of the size, who had pledged his account (passbook) on a loan,[6] and other restrictive things. These things are more fully covered in the Memorandum Opinion above-referred to, which is reported in 233 F.Supp. 578.

Further recitals could be made concerning this unbelievable litigation, but I will refer anyone who gives consideration to this matter to the more than 400 pages of printed opinions which appear in the reports of this court and the appellate courts, the titles and citations of which are set forth more particularly in footnote No. 1 of 233 F.Supp. 578, and to the above-mentioned joint Affidavit of Chapman and Trammell.

Numerous cases are cited by the petitioners in support of their position that they are entitled to attorneys' fees. As the judge who has sat through countless days and many nights in hearings, research and opinion writing over a 20-year period, I am thoroughly familiar with the work done and the ingenuity and skill and persistence required of the attorneys for the petitioners here, as well as the stubborn persistence and ingenuity of Government counsel in creating administrative and legal obstacles. There can be no doubt that the petitioners are entitled to a decent compensation.

Many cases are cited in support of the various elements to be taken into consideration in fixing attorneys' fees especially where they are dependent upon a contingency. Perhaps the most succinct are Angoff v. Goldfine (1 Cir., 1959), 270 F.2d 185, and Twentieth Century Fox Film Corp. v. Goldwyn (9 Cir., 1964), 328 F.2d 190, cert. den. 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87, the pertinent portions of which are quoted in footnote 7[7].

6. There were 324 shareholder-depositors with accounts of $500 or less, each of which was pledged as security for a loan against the account. It would be a prohibitive burden or any or all such small accounts to have undertaken litigations against the Bank Board and Insurance Corporation to enforce their pro-rata rights to the surplus of Long Beach.

7. Angoff v. Goldfine, 270 F.2d 185, pages 188–189 (1 Cir., 1959):
  "[3] * * * the following factors are to be carefully considered and weighed in fixing the amounts of compensation to be awarded in cases of this sort. These factors are: the amount recovered for the corporation; the time fairly required to be spent on the case; the skill required and employed on the case with reference to the intricacy, novelty and complexity of issues; the difficulty encountered in unearthing the facts and the skill and resourcefulness of opposing counsel; the prevailing rate of compensation for those with the skill,

experience and standing of the attorneys, accountants or others involved; the contingent nature of the fees, with the accompanying risk of wasting hours of work, overhead and expenses (for it is clearly established that compensation is awarded only in the event of success); and the benefits accruing to the public from suits such as this. And these criteria have frequently been spelled out by the courts. * * *"
  and further at page 190:
  "[5, 6] * * * if that [prior] proceeding in fact produced a benefit to the corporation on behalf of which the main action was brought, we fail to see why that benefit should not be considered in fixing counsel fees and expenses in the main action, for we do not think an attorney's compensation should be made rigidly to depend upon the precise means by which a fund is recovered for a victimized corporation.
  "* * * an attorney is entitled to an award of compensation based on ben-

In the last case it is noted that while the factors mentioned "are useful as guides in fixing such fees, they provide nothing approaching a precise yardstick. In the long run the weight to be accorded these and other factors in fixing the fees in a particular case must rest largely upon the good judgment of the district court."

In view of the very unusual nature of the litigation and the services involved in this case it is difficult to apply precise standards. The Ninth Circuit stated (*11 years ago*) that:

"* * * we have pointed up in our opinions that its unique and unprecedented pattern is without a counterpart in the books. No reported case or controversy has been called to our attention which even remotely resembles it. * * * It is our considered judgment that it would be impossible to find in the books a more unique, confusing and extraordinary pattern of litigation or one more shot through and through with 'exceptional circumstances.' * * * " Federal Home Loan Bank et al. v. Hall et al. (9 Cir., 1955), 225 F.2d 349, at 368, n. 8.

The petitioners' services began in 1946 and involved litigation concerning not only the seizure of the Association but the dissolution of the Los Angeles Federal Home Loan Bank and its transfer to San Francisco. All involved a stupendous amount of work of almost every conceivable kind in connection with those proceedings, and even the transfer back to the officers of the Association from the Home Loan Bank Board required this court to lay down procedures involving very great efforts in unbelievable detail in the matter of returning the Association in 1948. To give a small idea of what the first litigation amounted to, the court appointed a special master to preside over depositions and the turn-back and allowed him $90,000 as a fee therefor which was approved by the appellate court.

After that there was again another threatened seizure and further litigation

efits obtained by a corporation as a result of his efforts short of bringing suit. * * * "
and at page 191:
"* * * it was established long ago that agreements to pay a contingent compensation for professional legal services of a legitimate character is not in violation of federal law or public policy, even when prosecuting claims against the United States. Stanton v. Embrey, 1876, 93 U.S. 548, 556, 23 L.Ed. 983; Taylor v. Bemiss, 1884, 110 U.S. 42, 45, 46, 3 S.Ct. 441, 28 L.Ed. 64. * * * "
The Ninth Circuit in Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190 (9 Cir., 1964), cert. den. 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87, set forth some of the same factors in the following language, at p. 221:
"[31] * * * these factors [value of attorneys' fees] include: (1) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the Government, (2) the standing of counsel at the bar—both counsel receiving the award and opposing counsel, (3) time and labor spent, (4) magnitude and complexity of the litigation, (5) responsibility undertaken, (6) the amount recovered, (7) the knowledge the court has of the conferences, arguments that were presented and of work shown by the record to have been done by attorneys for the plaintiffs prior to trial, (8) what it would be reasonble for counsel to charge a victorious plaintiff, and (9) what contribution shall be made by the defendant toward the fees of plaintiff's counsel.
"While all or most of these factors are useful as guides in fixing such fees, they provide nothing approaching a precise yardstick. In the long run, the weight to be accorded these and other factors in fixing the fees in a particular case must rest largely upon the good judgment of the district court."
"* * * They [defendants] do question the necessity for much of this work. However, this is almost like saying that plaintiff could have won more easily—a not very telling argument when made by those who contend that plaintiff should not have won at all.
"The lawsuit was most vigorously contested from beginning to end. Numerous complex legal and factual issues were involved. * * * "

enjoining it. There were three congressional investigations; there was an effort to get the Association out of the federal system so as to merge it with Equitable which involved going through the California Savings and Loan Commissioner, requiring intricate proceedings, exhaustive factual and legal examinations and the like. During that process, there was again the second seizure in 1960, following which there was another congressional investigation.[8]

8. Exhibit 24 is a printed copy of House Report No. 2083, "Federal Home Loan Bank Board Seizure of Long Beach Federal Savings and Loan Association."

The Findings of the Committee appear on pages 19 and 20 thereof and read as follows:

"FEDERAL HOME LOAN
BANK BOARD—LONG
BEACH SEIZURE
"FINDINGS

"The subcommittee finds as follows:

"(1) The Board members were uninformed about many matters of regulatory policy and administrative routine governing their own Board's operations. They relied excessively on legal and supervisory staffs for information and advice on matters which ordinarily should be within their own competence.

"(2) The Board members and supporting witnesses were unacquainted with many facets of the Long Beach Federal controversy even though it has taken a large portion of their time and attention. The findings which the Board made as the basis for summary seizure presupposed a knowledge of facts and circumstances which the Board members did not possess.

"(3) The Board's inability to inform the subcommittee on many matters was compounded by its unwillingness to testify on others, based upon various claims of privilege. In the first instance, the Board entered a general refusal to testify and challenged the propriety of the subcommittee's inquiry by claiming judicial privilege. In the course of the testimony several variants of executive privilege also were claimed.

"(4) Notwithstanding that privilege is a highly personal and nondelegable matter, Board Chairman Robertson was unacquainted with the legal basis of his claim and was unable to amplify or illumine in any particular a prepared statement which he read to the subcommittee in asserting the claim of judicial privilege. Upon examination of the legal and other citations in the statement, the subcommittee found no grounds whatever for the claim.

"(5) To justify summary seizure of Long Beach Federal without prior notice, the Board was required to determine that an emergency existed. The charges cited by the Board as the basis for the seizure order dated back 11 or 12 years in some instances, 2 or 3 years in others, and in any case involved matters which were known to the Board or its supervisory staff and discussed with the association from time to time. The record shows that the Board had discussed the possibility of seizing Long Beach Federal over a period of years but did not decide to take such action until after it learned that the association had applied for a State charter.

"(6) Some of the charges cited in the Board seizure order concerned matters in pending litigation, and for the association to comply in the manner sought by the Board would have required the association to prejudice its own position in the litigation.

"(7) If any or all of the charges cited in the Board seizure order were valid and justified, then the Board was derelict in its duty in failing to issue explicit supervisory letters or 'stop' orders and require compliance over the course of time which encompassed the matters charged.

"(8) The Board would have been derelict in its duty even if an emergency had existed, since these charges should not have been allowed to accumulate. However, it is very clear that an emergency of the type contemplated in the 1954 amendments to the National Housing Act (12 U.S.C., sec. 1464) did not exist. Summary seizure was chosen as one of several supervisory techniques, as 'the better way to handle it,' and for this reason the Board's action was an arbitrary and unlawful exercise of power.

"(9) A better explanation of the summary seizure action was the Board's unwillingness to permit Long Beach Federal to convert from a Federal to a State-chartered association, which conversion is permitted by law. The seizure order came on the heels of an application by Long Beach Federal to the California State authorities for conversion and a subsequent examination by State examiners, which was interrupted by the seizure action.

"(10) The Board contemplated, when it directed the seizure, that there would be a 'run' on the association by depositors, and it arranged in advance for a $30 million loan by the Insurance Corporation to the association. At the time of

There were claims for damages by the Association against the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation, and the individual members of the Board and other officers of the Board. These were not ephemeral and trivial, as indicated by the fact that in the Settlement Agreement the Federal Home Loan Bank Board and Insurance Corporation in effect agreed to, and did, pay $5,000-000 as damages by way of discharging interest and other obligations of Long Beach Association in that amount. The handling of the Association by the agencies of the Federal Home Loan Bank Board caused litigation and trouble from others. Just for one illustration, there the hearings, 6 weeks after seizure action, approximately $37 million had been withdrawn from the $96 million association.

"(11) The Board exercises its regulatory powers largely by informal conferences, conversations, and correspondence and by threats to exercise more drastic methods if corrective actions decided by the Board or its supervisory staff are not taken. These informal methods of regulation, largely unrecorded and lacking procedural uniformity, place a vast machine of personal power in the hands of the Director of Supervision, who supervises more than 1,800 Federal associations.

"(12) The Board has ignored the intent of Congress and the plain meaning of the law in failing to formally notify the association of alleged violations of laws and regulations and give it opportunity to take corrective action. In the 6 years, since the Congress provided for such administrative action, the Board has utilized this procedure in only a single instance. The congressional enactment has fallen in a crack between informal, personal supervision on the one hand and drastic seizure on the other.

"(13) The supervisor in charge of Long Beach Federal acted arbitrarily and unfairly in summarily discharging more than a score of employees without allowing sufficient time to review their capabilities and loyalties. Further, the importation of employees from other savings and loan associations, which were competitors of Long Beach Federal, was unwarranted and prejudicial to the interests of Long Beach Federal.

"RECOMMENDATIONS

"Notwithstandings the lack of cooperation on the part of the Board witnesses, the subcommittee did secure substantial information under oath to justify the following recommendations, and based upon the information secured, the subcommittee recommends as follows:

"(1) The Board should restore forthwith Long Beach Federal to its former management.

"(2) Upon restoration of Long Beach Federal to its former management, the Board should then determine which of its charges still have merit, should state them in a clear and definite manner, and should utilize the procedures prescribed in section 5(d) (1) of the Home Owners' Loan Act of 1933, as amended, to duly notify the association and to request corrective action.

"(3) As a general policy, the Board should give effect to section 5(d) (1) of the Home Owners' Loan Act of 1933, as amended, by formally specifying charges when violations of law or regulations are alleged, duly notifying the associations concerned, and giving them opportunity, as prescribed by law, to take corrective action.

"(4) In effecting the return of Long Beach Federal to its former management, the Board should utilize the financial and credit resources of the Federal Savings and Loan Insurance Corporation and the Federal Home Loan Bank of San Francisco to enable the association to repair the damage done by the seizure and to regain its previous business position.

"(5) If and when any Federal association's shareholders, by the means prescribed in the law, record their wish to convert from a Federal to a State association, the Board should refrain from interfering and putting obstacles in the way of this conversion.

"(6) The Board should make a concerted and whole-hearted effort to bring to a close long-standing legal controversies with Long Beach Federal by settlement or compromise of the litigation or by withdrawal of interferences to a speedy resolution of the litigation.

"(7) The Board, in exercising its supervisory authority, should refrain from using this authority to circumvent or interfere with litigation properly brought to the courts by savings and loan associations.

"(8) Pending revision of the applicable legislation, the Board should by regulation establish uniform criteria for determining what constitutes unsafe or unsound practices of association management."

was a large loan of about $20,000,000 where a subdivision was being developed with a golf course and other facilities, all of the money for which was handled through the Long Beach Association. When the supervising agent in charge for the Home Loan Bank Board came in in April 1960 he stopped all advances of money, and (apparently either he or those in Washington were unfamiliar with the mechanics lien laws of California) he testified from the stand that he was instructed not to record the $20,000,000 trust deed, and it was not done until the court ordered it to be done about 60 days later in the course of one of the hearings, so that the trust deed note of the seized Association would be ahead of any mechanics liens for labor and material. Simple prudence in the management of the seized Association would have required the immediate recordation of that trust deed upon seizure and stoppage of the flow of construction money.

The Settlement Agreement itself is a long, complicated, involved document, and provided for the dismissal of the then pending litigation, the return of the Association to its elected management, the discharge of $5,000,000 in interest and other obligations heretofore mentioned; and it *approved* the proposed merger between Equitable and Long Beach, and *distribution of the Long Beach surplus pro-rata among its shareholder-depositors* which, as hereinbefore indicated by the uncontradicted testimony before this court, the Government defendants reneged on after the return of the Association. As hereinbefore stated, there followed another congressional investigation, and finally a merger agreement

resulted with heretofore-mentioned restrictive conditions in it which were contrary to the Settlement Agreement and which the Association contended, and which were contrary to law and which resulted in the three suits upon which judgment was entered by this court in May 1965 and are now on appeal.

There can be no doubt that it was the result of the litigation commenced by Attorney Chapman and his continued and persistent and resourceful efforts, and by the Shareholders Protective Committee, that the Association was finally returned, and thus the Long Beach Association and Equitable were able to complete the merger on September 10, 1963, negotiations for which had begun in 1958, which resulted in the 791,650 shares of Equitable stock for distribution to Long Beach depositors.

In the Settlement Agreement, the Association and the Shareholders' Protective Committee, the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation agree that the Government agencies will not *object* to attorneys' fees "for past unpaid-for services to the date of the Agreement (February 14, 1962) *arising out of the prior conservatorship in 1946–1948 in an amount not exceeding $500,000.*" (Article XIII, c.) The Government contends that that, together with a provision in the Proxy Statement, limits any fee to Mr. Chapman to that sum.[9] I do not so read either, and, taken both together, a contrary conclusion is required.

It is to be noted in the Settlement Agreement (p. 39) that it only relates to *"past unpaid-for services to the date of this agreement arising out of the prior conservatorship in 1946–1948 in an*

---

9. "(3) The Association, in arranging for ultimate discharge of the balance of its liability to Attorney Charles K. Chapman for his services in connection with the 1946–1960 seizures litigation, made $504,000 loans to said attorney secured by shares of the Association issued to U.S. National Bank of San Diego as trustee under Installment Charity Trust. Said share loans and Association's liability for said attorney's fees in said litigation are

to be concurrently cancelled in installments over a 15 years or longer period. The Association has established a specific reserve out of undivided profits (per Settlement Statement) for its full liability in connection herewith; and, as its obligations for payment of such fees are discharged, the specific reserves therefor will be restored to Undivided Profits and legal expense will be charged."
Quoted from Proxy Statement re merger.

*amount not exceeding $500,000.*" It says nothing about limitation of the fees to prevent the attempted seizure in 1959; it says nothing about the services after or during the 1960 seizure. It says nothing about the services in connection with either the negotiation of the Settlement Agreement or the merger or the three instant suits plainly contemplated by the merger agreement, or numerous other services. The portion of the Proxy Statement quoted in footnote 9 plainly indicates the loan does *not* contemplate the "ultimate discharge" of liability for Chapman's services by it. The merger agreement *must* be read with the Settlement Agreement, as is indicated not only by the two agreements but by the Proxy Statement [Exhibit E, pp. 16, 18, 21, 23, 44, 45 and p. 51].

The Government contends that the $504,000 mentioned in the Proxy Statement and quoted in footnote 9 is actually a *payment* of $504,000 to Attorney Chapman. These are *loans, not payments. Attorney Chapman still owes $504,000,* and by his undisputed statement has already paid some $35,000 in interest to the Long Beach Savings for the use of the money. The advantage to Attorney Chapman by virtue of the loan comes only because he pays a low interest rate of $1\frac{1}{4}\%$ and is able to reinvest the money at a higher interest rate, and because the loans are for a period of 20 years or until after his death. While his *creditor,* that is, the *owner* of the notes, changes, on conditions, from the Long Beach Association to philanthropic associations, *Chapman still owes the $504,-000,* and will have to pay interest *until* he, or his estate, repays to someone the whole $504,000.

The loan does have a *present value* as of the date of the merger, which, according to standard practices, can be appraised. At the court's suggestion the petitioners secured an expert who gave an appraisal of the present value on that loan in November 1962 of $109,527, and the court finds that that was the value to Attorney Chapman of that loan on that date.

To try and segregate the services here rendered by the petitioners in connection with the different facets of the many proceedings and things done by Mr. Chapman would be like trying to pinpoint each color in a thousand foot wall painted with a paint which had been blended out of every color of the rainbow.

The one thing which is outstanding in connection with attorneys' fees is that almost everything which has happened in all the litigation and hearings was interlinked somewhat and somehow with every other thing that was done or attempted. For instance, there could have been no merger, and hence no surplus permitting the 791,650 shares to be distributed to the shareholders of Long Beach Federal Savings and Loan Association, if the Association had not been returned *from* the *first* seizure, and *from* the *second* seizure; and in an overall appraisal of the series of events involved, the merger, which was the heart of the Settlement Agreement, was the final act which not only produced the value to the surplus but took the Association out from under what it considered to be the harassment of the Federal Home Loan Bank Board.

While it is true that in the Settlement Agreement a $5,000,000 advantage was obtained by way of what Mr. Chapman calls damages for the Long Beach Association, and while it is true that $3,-000,000 was paid for the goodwill of Long Beach Association by Equitable, and while it is true that a tax advantage accrued in the sum of probably several million dollars by virtue of the manner of handling the whole transaction, and while it is true that the $3,000,000 contemplated to be put in escrow for ten years under the Settlement Agreement by the Long Beach Association was released for immediate use by Equitable, and while it is true that the merger resulted in a more than $150,000,000 institution, nevertheless all of these things culminated in one tangible benefit to the depositor-shareholders of Long Beach, namely, the right to a pro-rata share of 791,650 shares of Equitable stock received as a bonus or surplus from Equi-

table in addition to having Equitable assume the full and complete responsibilities for all of their deposits as they stood at the time of merger, and also assuming all liabilities of Long Beach. The last-mentioned are intangibles and have great value to Long Beach, but I see no way of placing a dollar value on them.

One intangible was getting the Board, through the Insurance Corporation, to take over the entire 20 million dollar Bellehurst loan, which is still in litigation.

No matter how the appellate court decides the appeals in these three cases, 791,650 shares of Equitable stock still must go to the shareholder-depositors of Long Beach. While they may go in proportions which are contrary to law, nevertheless they do go to them as a benefit.

The Government complains that the papers filed by Mr. Chapman in connection with the various litigation were prolix and unnecessary. I concede, as the judge who has had to examine and read every one of them, that some of them are a little long, but I cannot say that they were unnecessary. It is an old axiom, which some lawyers learn only from bitter experience, that it is much better to have an essential allegation in a document than to have it out.

In considering the nature of the opposition, I can draw on my own experience of 50 years at the bar with 25 years on the bench, and say that I have never seen a lawsuit where the plaintiffs encountered a more stubborn and determined opposition than the Long Beach and the Shareholders' Protective Committee have incurred to date from the Federal Home Loan Bank Board. Every conceivable administrative and legal obstacle has been invoked. It is only with what I must say has been remarkable ingenuity, experience and perseverance on the part of the petitioning attorneys in this case that any results have been achieved at all, and they have done so *knowing* the payment of any fees was *contingent* on success.

One of the elements emphasized in the reported decisions is the contingent nature of the fee. The testimony is uncontradicted that as far as the services of the petitioners are concerned, they agreed from the beginning that their fees would be of a contingent nature and would ultimately be set by the court. Certainly, if they had never recovered the Association and the merger with Equitable had never been effected, there would have been no occasion for any fees. And to indicate the risk they took, the evidence is uncontradicted concerning the overhead borne and paid out by Mr. Chapman and by Mr. Trammell. The total overhead by Mr. Chapman for the years 1958 to the end of 1964 is $627,929.35, to which he attributes—without any contrary testimony, I again must emphasize—that $302,575.83 is the share of the overhead attributable to the *merger*, without regard to the seizure and other litigation.

Mr. Trammell's total overhead from the year 1960 when he came into the case to 1964 is $101,610.35 to which he attributes $23,776.90 to the services in connection with the merger. Thus there is over $325,000 in overhead which the petitioners here had paid out in order to accomplish the *merger* only, which is only part of the services rendered and results obtained in this case.

The two experts who testified, Mr. Simpson and Mr. Belcher, are men of outstanding ability and a long period of practice in intricate and involved litigation. The testimony was that the fees to be paid to the petitioners should be between 25% and 33% of the benefit accrued. As heretofore indicated, the benefit accrued was the 791,650 shares of stock.

The only possible way to fix a fair fee in this series of extraordinary disputes and litigation is to take into consideration the ultimate benefit achieved, viz., 791,650 shares of Equitable stock; fix a year by year value for the services rendered, and subtract the amounts previously received on account.

To state this in terms of dollars, it is first necessary to fix the per share value of Equitable stock. The *book* value, in my judgment, is nearest the measure of true value for the purpose of this determination as opposed to market· value either at the date of the merger or the date of the hearing. The undisputed testimony is that the book value on the date of the hearing was approximately $8 per share. Upon that testimony and after examination of the December 31, 1964 Financial Statement of Equitable [Exhibit 16], I find $8 per share to be the value of each share of the 791,650 shares of stock, for the purposes of determining fair and reasonable fees to petitioner.

In early 1949 I allowed Attorney Chapman $270,000 fees on account for his services from May 1946 to the end of 1948, but, upon representation of the Assistant to the Attorney General that the litigation would be forthwith settled, a stipulation was made that the payment of two-thirds thereof was stayed and only $90,000 was paid to him.

Within less than a week that stipulation was repudiated by the then Attorney General without consultation with the judge who had approved the stipulation upon representation that the then Attorney General personally approved it. At that time the allowance was· only on account, and the said stipulation included terms that the Association would be returned, the cases would be settled and that the court would determine the total fees to which Attorney Chapman would be entitled.

That the value of Mr. Chapman's services in connection with the 1946 seizure was far in excess of $270,000 is indicated by the hereinbefore-mentioned provision in the Settlement Agreement approved by the Bank Board which, in effect, conceded his services in connection with that seizure were worth at least $500,000 in addition to the $90,000 paid ·him on account. Those services, how-

ever, continued long after 1948, not only in attempting to get an accounting from the conservator but in State court lawsuits [10] resulting from acts taken by the conservator.

In viewing the whole kaleidoscope of the numerous controversies and innumerable problems, which were continuous, and the results achieved, the sum of $90,000 per year for each of the 19 years from May 1946 to December 1964, inclusive, for Mr. Chapman's services is reasonable and fair, and I so find.

I therefore conclude that the reasonable value of Mr. Chapman's services are fixed and allowed as follows: $90,000 for each of the years 1946, 1947, 1948, 1949, 1950, 1951, 1952, 1953, 1954, 1955, 1956, 1957, 1958, 1959, 1960, 1961, 1962, 1963, and 1964. From these sums there is to be subtracted the sum of $90,000 paid Attorney Chapman *on account* in 1949, the sum of $160,000 paid *on account* in 1962, the sum of $109,527 *on account* (the present value of the $504,000 loan as of November 15, 1962), and $65,000 paid him *on account* as mentioned in Exhibit 12, page 2, lines 5 to 8, which totals a deduction in round numbers of $22,000 separately for each year of the 19 years. That leaves the net sum of $68,000 which I fix and allow as the reasonable unpaid value of his services, separately, for each of the years 1946 to 1964, inclusive, to be ·paid Attorney Chapman.

It is to be distinctly understood that nothing herein said is to be considered or construed as allowing a lump sum fee in any amount, but each year's work is to be compensated as a separately allowed fee for each year to Attorney Chapman only as above stated.

Coming now to the attorney for the Shareholders' Protective Committee. Counsel requested that one fee could be allowed and divided by agreement between them. But it has not been treated that way by the parties, the lawyers, or the Bank Board. And I do not think

10. Divorces, condemnation, quiet title, income tax, fraud and almost all other kinds of litigation.

it should be treated that way now. The great bulk of the work has been done by Chapman, and he has carried the expense, even to paying out of his pocket a fee of $50,000 to a lawyer for assisting him in one phase.

By the Settlement Agreement, Article XIII, the Bank Board agreed to interpose no objection to:

"b. Attorneys' fees for services rendered *to date* by attorneys for the Shareholders' Protective Committee and trustees under deeds of trust in connection with litigation arising out of said prior conservatorship, in an aggregate amount not exceeding $100,-000; and attorney fees and costs paid in settlement of the San Francisco Bank litigation". (Italics supplied.)

This sum has been paid, and Mr. Trammell, who became attorney for the Shareholders' Protective Committee in 1960, acknowledges payment for all his services, except in connection with the merger. His services have been continuous in that respect since 1960. He thus has five years of services on the merger uncompensated, for which the sum of $10,000, separately, for 1960, 1961, 1962, 1963 and 1964 is reasonable and is fixed and allowed, not as a lump sum fee but for each year separately.

The allowances made herein are well within the range of totality testified to by the experts.

■ The question now arises as to whether or not any of this sum can be assessed against the defendants. I do not think any of it can be assessed against the Calforna State Building and Loan Commissioner, and indeed I do not think it should be, because he has only been more or less a formal defendant. I do not believe that any of it can be assessed against the Federal Home Loan Bank Board because, howsoever grossly wrong their actions may have been, the acts which the Board did in this case were governmental actions and it was not acting in a proprietary capacity.

However, the Federal Savings and Loan Insurance Corporation is a sue and be sued corporation; it is not engaged in a governmental capacity; it is engaged in a proprietary business, and collects premiums paid by depositors. It is run by the same people who run the Bank Board although they wear a different hat. But in looking at the *Settlement Agreement* as a whole, it is the opinion and judgment of the court that the $5,-000,000 advantage secured by Long Beach by the Settlement Agreement comprehended whatever liability the Federal Savings and Loan Insurance Corporation had for attorneys' fees.

In discharging the judgment, the 71,-183 shares of stock remaining in court, after compliance with the prior judgments of the court, may be used in whatever manner is agreeable to petitioners and Equitable to be expressed by stipulation, subject to approval of the court.

I am of the present opinion that this Memorandum contains all the findings of fact and conclusions of law which are necessary under Federal Rules of Civil Procedure 52(a), but petitioners may, within five days, suggest that they desire additional findings and conclusions to be submitted later, if they deem them necessary or proper. If not, this will also serve as the formal order of allowance.

### ADDITIONAL FINDINGS

By the merger agreement of June 12, 1963 by and between Long Beach Federal Savings and Loan Association and Equitable Savings and Loan Association said Equitable assumed and became subject to all of the debts and liabilities of said Long Beach Federal as though Equitable had incurred them. Among such debts and liabilities so assumed by Equitable, to which it became so subject as though Equitable had incurred them, are the liabilities and obligations for attorneys' fees set forth in said memorandum and opinion and in the judgment made thereon.